IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RAYMOND J. HARDING, | ) | 4:12CV3196 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Raymond J. Harding, brings this suit to challenge the Social Security Commissioner's final administrative decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. Procedural Background

Plaintiff is a 48-year-old man who has a 7th or 8th grade education and work experience as a construction laborer and garbage collector. He claims to have been disabled since December 15, 2006,[2] due to various physical and mental impairments. His applications for DIB and SSI were denied initially on June 16, 2008, with the Commissioner explaining:

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

[2] In applications filed in March 2008, Plaintiff claimed a disability onset date of July 1, 2005 (Transcript ("Tr.") (CM/ECF filings 9, 10, 11), 343, 348). He later amended the claimed onset date to December 15, 2006 (Tr. 48).

You said that you are unable to work due to lower back problems, a cyst on your spine, PTSD, OCD, a history of alcohol dependence, intermittent explosive disorder, borderline personality disorder, depression and pain. The medical evidence shows that you have received treatment for some of these conditions in the past. The evidence also shows that although you may experience some discomfort, you are able to move about in a satisfactory manner with adequate use of your arms. Your neck and back have also shown some improvement with recent injections. Although you may become depressed at times, you are able to think, act, and communicate on your own behalf and tend to your own day to day personal needs. We realize that your conditions may cause you some pain and work limitations. You should avoid work activity that requires heavy lifting, frequent crouching, stooping, and the need for special skills. Although you may be unable to perform your past work, you should be capable of performing some lighter types of jobs. Therefore, we are unable to establish disability benefits for you.

(Tr. 182)  The applications were also denied on reconsideration, on October 10, 2008, for essentially the same reasons (Tr. 188).  Following these denials, Plaintiff filed a request for an administrative hearing (Tr. 193-194).

Jan E. Dutton, an administrative law judge ("ALJ"), held hearings in Lincoln, Nebraska, on January 6, 2010 (Tr. 43-83), and June 9, 2010 (Tr. 84-114). Plaintiff was represented by counsel and testified at both hearings.  Testimony was also provided by a medical expert and a vocational expert at both hearings. The ALJ issued an unfavorable decision on July 15, 2010, concluding that although Plaintiff is unable to perform any past relevant work, he is not disabled.[3] On November 18, 2010, the Appeals Council of the Social Security Administration granted Plaintiff's request for

---

[3] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§ 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

-2-

review and remanded the case for further proceedings because the ALJ's decision did not adequately evaluate Plaintiff's mental impairments.

A third hearing before Judge Dutton was held on May 11, 2011, in Lincoln, Nebraska (Tr. 115-151). Plaintiff once again was represented by counsel and testified at the hearing. A vocational expert also testified. On June 15, 2011, Judge Dutton issued another unfavorable decision (Tr. 14-42). Using the 5-step sequential analysis prescribed by Social Security regulations,[4] the ALJ made the following findings:

**1. The claimant met the insured status requirements of the Social Security Act through only March 31, 2010.**

**2. The claimant has not engaged in substantial gainful activity since December 15, 2006, the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)**

---

[4] The Eighth Circuit has described the procedure as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ("RFC")] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

The claimant has apparently performed some work activity since that date. The record reflects several entries and comments about his work activity and employment since then.

For example, in March of 2007 a clinical note states that he is starting a job with insurance benefits the next day. (Exhibit 17F/6)

A notation dated October 5, 2007 indicates that he was "going to work" on a garbage truck and was "starting on (a) sub-contractor job". (Exhibit 15F/5)

On December 14, 2007, it reflects that he was then driving a garbage truck but was "fired by (his) nephew". (Exhibit 15F/3)

On February 27, 2008, a medical professional wrote that the claimant was "hauling furniture" and driving a truck. (Exhibit 15F/l)

On April 7, 2008, the claimant wrote that he had most recently been employed in 2007. (Exhibit 25F/43)

At an initial physical therapy session on July 2, 2008, the claimant reported he had been injured when he was "carrying beds to Super 8" and his back was "thrown out". (Exhibit 28F/l)

The physical therapy notes from April of 2009 reflect that the claimant was interviewing for a job as a janitor with the local public school system. (Exhibit 45F/3) A note dated about a week later (April23, 2009) reflects that "he did get his job (with the school system), which is encouraging. (He) feels quite comfortable in progressing to that job and that program". (Exhibit 45F/2)

The claimant was seen at an emergency department on August 30, 2010 where he complained of back pain. He said he had been "throwing some stuff into the garbage can at work". (Exhibit 63F/50) The notes from that visit also say that the claimant "works for his landlord and was vacating a house". The claimant stated he had a "40-pound lifting restriction" but he "helped move a couch and was in the process of throwing it into a

-4-

dumpster and learned forward with the end of the couch". (Exhibit 63F/53)

He was treated again at an emergency room in September of 2010. He stated then that he had been "packing and moving" but had not experienced any specific injury. (Exhibit 63F/40) At the hospital, the doctor wrote that the claimant "admits that he is noncompliant with his restrictions at work because he has to work and make money". (Exhibit 63F/42)

The undersigned notes that none of this work activity or the resulting earnings are entered on the claimant's earnings record maintained by the Administration.

Because the extent of his work activity is unclear, the undersigned gives him the benefit of all doubt on this point and continues with the sequential evaluation process. However, as mentioned below, this work activity is relevant to determining the credibility of the claimant's assertions regarding his functional limits.

**3. The claimant has the following severe impairments: the residuals of fusion surgery in his cervical and lumbar spine. Mental-anxiety, depression, personality disorder and cannabis dependence. (20 CFR 404.1520(c) and 416.920(c))**

These conditions are "severe" because they result in more than minimal limitations in his ability to perform basic work-related activity.

The record reflects that the claimant began to receive treatment for pain he reported in his back as early as 2005. (Exhibit 1F/7) In August of that year, he alleged that he was injured on August 1, 2005 while at work for a construction company. (Exhibit 5F/4) (He has also stated that he hurt his back when "carrying beds at a Super 8" motel. (Exhibit 29F/5))

The claimant received conservative care for several years after 2005 including medication; physical therapy; and "19 injections" in the middle of 2008. (Exhibit 29F/5)

In the early part of 2009, he had fusion surgery on his lumbar spine. He received additional physical therapy after that surgery. (Exhibit 45F)

The claimant had additional surgery on April 2, 2010 to fuse vertebrae in his cervical spine. (Exhibit 54 F)

Just two days after he left the hospital for that surgery, he went to a hospital emergency department and said he had a "sunken chest" as well as pain when he coughed or "burped" and some shortness of breath. The staff noted some "slight redness" below his clavicle, which was reportedly tender but made no mention of any apparent problem with his neck or with the site of the surgical incision. (Exhibit 55F/2)

About two weeks later, he was back at the emergency room—this time for complaints regarding his left shoulder. He reported that, while trying to get out of bed, his left shoulder "popped out in front of him" but he "got it back into place". He reported 10/10 pain in his shoulder but said his neck was not causing any problems. He reported that he was not taking any medication for pain. The x-rays of his shoulder were negative. (Exhibit 58F/5)

He returned to see the surgeon, Dr. Tomes, about two weeks later on April 27, 2010. He apparently made no mention at all of his two visits to the emergency room in the three weeks since his neck surgery. However, he did mention that he had been in "two motor vehicle accidents here recently". The doctor observed that he reported stiffness but no pain in his neck. The x-rays showed some bone growth and no loosening of the hardware in his cervical spine. He advised the claimant to "gradually increase his activities or daily living". (Exhibit 57F/1)

The claimant was examined by another doctor only two days later. Despite not mentioning any shoulder problems to Dr. Tomes, he told her his shoulder had been "very sore" since he "popped" it back into place. He said he was having no neck problems and that the numbness in his fingers was gone. He reported that he had tried ibuprofen but it did not help. He was still having trouble moving his shoulder. She prescribed Norco (hydrocodone and acetaminophen) and Celebrex for him and arranged for additional physical therapy for his shoulder. (Exhibit 58F/9)

-6-

The claimant started a course of physical therapy on June 2, 2010 to address his complaints of pain in his left shoulder. The therapist noted that the x-rays of his shoulder were negative. The claimant was unable to even place his left arm in the positions required for the therapist to test his strength. (Exhibit 62F/5)

The claimant attended only three of eight scheduled therapy sessions. He was discharged due to this noncompliance. (Exhibit 62F/l)

He was evaluated at an orthopedic center in July of 2010 for his left shoulder pain. There is no indication in the record that he mentioned that he had received any physical therapy for his shoulder. He said he was experiencing sharp and severe pain despite the use of ice, heat, and hydrocodone. He had no swelling in the shoulder and his strength in his shoulder was nearly full at 5-/5. He had no visible atrophy. His neck appeared to be normal with no tenderness. The PA-C who treated him gave him a cortisone injection in his shoulder and recommended six weeks of physical therapy. (Exhibit 65F/2)

There is no additional medical treatment reflected in the record until over six months later—in late February of 2011. The claimant went to a hospital emergency department that day with a "bump on his head" after he "hit (his) head on a pipe at work". (Exhibit 70F/24) Elsewhere in the notes from that visit, it reflects that he was "in his basement, stood up, and smacked his head on a pipe". (Exhibit 70F/26) The notes from that visit also indicate that the claimant uses "narcotics" but does not "take any home medications". (Exhibits 70F/24 and 70F/30).

Mr. Harding returned to see his surgeon, Dr. Tomes, in March of 2011. He told the doctor his neck was "popping quite often" which caused severe headaches. The doctor observed that he was alert and he had good muscle tone and strength. He had good range of motion in his neck. He ordered some x-rays of his neck, which "looked fine". The doctor concluded his neck "popping" was due to arthritis. He said it was "OK to continue to be up and around" and that there was no need for further surgery. (Exhibit 69F)

The claimant went back to the hospital emergency room in April of 2011 and complained of a sebaceous cyst on his neck. Again, the notes reflect that he uses "narcotics". (Exhibit 70F/5) The staff wrote that he had "no myalgia, muscle weakness, joint pain, or back pain" and that he appeared to be well with "no apparent distress". His neck was supple and non-tender and he had normal range of motion in all his extremities. (Exhibit 70F/7) The cyst on his neck was incised and drained. (Exhibit 70F/7) There is no indication in the record of any further problems with abscesses or cysts.

There is no evidence of additional treatment for his severe physical impairments in the record.

**Mental:** The claimant received some treatment at a mental health center from about December of 2007 until about July of 2008. He then resumed his treatment there from about October of 2008 until December of 2008. While there, Dr. Clyne, a psychiatrist, prescribed medication for him. In October of 2008, he told her his medications were "working for him" with no side effects. He had no anger outbursts. He was cooperative and he specifically denied any depression. He was alert and oriented. His memory and judgment were good. (Exhibit 51F/9) He was discharged from that program after he "frequently failed to attend or schedule appointments" and, following his release from jail, he "chose to not follow through" with his treatment. (Exhibit 51F/l)

The claimant was examined by a consulting psychologist, Dr. Ihle, on February 10, 2011. He noted that the claimant was taking no medication then. The claimant was cooperative with the psychologist. He stated that crowds of people make him nervous "and he leaves shaking and gasping for air" for 10-15 minutes. (Exhibit 66F/2) The doctor noted he was alert and oriented. Mr. Harding claimed to be unable to spell the word "world" and said he could not recall the name of the previous president. (The undersigned notes that the claimant submitted a form that he completed without assistance in which he correctly spelled words such as "appointments", "automotive", "cervical", "medial", and "continue") He told the psychologist that he spends his time at home caring for his 2-year-old daughter and trying to help his "fiance". (Exhibit 66F)

-8-

Based on his examination, Dr. Ihle expressed some opinions regarding the claimant's functional limitations. Those opinions will be discussed below in Finding# 5.

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has only a mild restriction. The consulting psychologist, Dr. Ihle, noted no limitations at all in daily activities resulting from his mental condition. In social functioning, the claimant has no more than moderate difficulties. He has consistently been cooperative with those who have examined him.

With regard to concentration, persistence or pace, the claimant has only mild difficulties. There has been no indication in any progress notes that he is unable to concentrate on simple and routine matters.

The evidence shows he has experienced no episodes of decompensation.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes

of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can balance, stoop, kneel, crouch, and crawl only occasionally. He cannot climb ladders, ropes, or scaffolds. He can flex, extend, and rotate his neck only occasionally. Mental—he can perform unskilled work categorized as SVP-1 or SVP-2 that is routine and repetitive work that does not require extended concentration or attention. He can handle occasional social interaction with coworkers, supervisors, and the public, avoid constant or intense social interaction.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

The claimant testified that he stopped working in 2006 as a garbage truck driver because he was "having trouble getting into and out of the truck"

-10-

and difficulty placing garbage in the rear of the truck. He said he did not consider that his surgeries were successful because he was having the "same problems" with his "back still popping" and his back still "swelled up".

He said he received physical therapy that occurred "way after" his back surgery. He said he continues to have pain in his back and that it sometimes feel like a "big knot" in his back and neck. He has difficulty picking up his daughter and, when he bends down, his back sometimes "locks in one position". He said he sometimes feels "unsafe" so he enlists the aid of his fiance to help him get out of the bathtub. He said he has to "take a break" after walking "a couple of blocks."

He said he "gets angry really, really, really fast" and "it doesn't matter" what the target of his anger might be. He chuckled and said, "It's kind of hard to explain because I don't know that I'm doing it really". He said, "I kinda keep it controlled. I don't throw things or flip over the coffee table or pick something up and throw it and break it" as he did in the past. He said he does "not take authority from my boss very well". He tells them "in an angry way" if he disagrees with them. He said that "3/4 of the time I quit my job and walk off the job and then have to deal with my boss trying to get my job back". He also said he has "blown up" when interacting with co-workers and that he prefers to work alone.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause at least some of the symptoms he described. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible.

There are several factors that tend to detract from the claimant's credibility.

On December 15, 2006, (his alleged onset date) the claimant received emergency medical care for his alleged pain in his elbows. He said he had pain and "large lumps" on his elbows for the preceding four months. He also said he had chronic neck pain and that the "light in the room (was) bothering his neck pain". He had no swelling or inflammation in

-11-

his elbows. The doctor concluded that his alleged sensitivity to even "extremely light touch" of his elbows was "out of proportion" to the examination.

The notes from that encounter make no mention at all of any back pain. (Exhibit 18F /72) His assertion at the hearing that he could not work then due to pain in his back is unlikely to be accurate.

On December 22, 2006 (exactly one week after he alleges he became disabled), the claimant was working on a ladder to hang some Christmas lights on a house. He fell and received emergency medical care. He said he had pain in his left arm after the fall. However, he specifically denied any pain in his back. The doctor who examined his neck noted it was "supple with full range of motion without pain". (Exhibit 18F/64)

Again, this causes the undersigned to doubt his claim that he stopped working on December 15, 2006 because of pain in his neck and back.

The claimant was apparently involved in a vocational rehabilitation program after his neck surgery. His surgeon sent "paperwork" to "Arbor E&T"—a Nebraska rehabilitation and workforce contractor. (Exhibit 57F/2) However, he has not mentioned that program in the documents he supplied to the Administration or in his testimony.

When Dr. Tomes examined him on June 22, 2010, he had full strength in his upper extremities. (Exhibit 61F/l) However, when the physical therapist tried to measure his strength and motions in his shoulder a few weeks earlier, the claimant was unable to even hold his arm in place so he could be tested. (Exhibit 62F/4)

On April 17, 2010, the claimant went to a hospital emergency department and reported pain in his left shoulder. He provided a detailed recitation of how the pain started by saying "he was trying to get himself out of bed, and he saw his left shoulder pop out in front of him. He twisted his arm a couple of times. He got it back into place. (Exhibit 58F/4) However, when he went to a different emergency room on May 10, 2010, he reported that he had no history of trauma to his shoulder. (Exhibit 63F/60)

**Mental Treatment and opinion of Dr. Clyne and discussion of testimony of psychological medical expert:** As noted above, claimant briefly sought treatment at a mental health clinic for dual diagnosis (cannabis dependence and depression/anxiety). He was given a mood stabilizer depakote and lamictal. Clinic notes at 16f show a few months of treatment with Dr. Clyne, then a gap of several months, and ultimately she filled out some "checklist" questionnaires at request of his attorney for disability hearing. Claimant never returned to the clinic for medications after he went to jail in mid 2008. There is no verification he ever stopped using marijuana on a daily basis, as he reported he had done since age nine.

In December 2008 Dr. Clyne (who had treated claimant 11 months) signed a document that was prepared in the handwriting of another person (author unknown). Dr. Clyne wrote that he has mood swings and "has almost had several behavioral outbursts. His moods have improved over the last year he is using his coping skills better. He has periods where it is evident he is unfocused, unmotivated and depressed." Prognosis is fair/guarded. Exhibit 39f/40f/41f

The underlying progress notes from Centerpointe (a dual diagnosis program are found at 16f) revealed that claimant was not attending AA or NA, even though he found the programs helpful. He reported marijuana usage from and nine until the day of interview (December 17, 2007); reporting marijuana use on a daily basis and use of on ounce or so per week, he uses anywhere from $100 to $150 dollars a week to purchase this drug. He has been using marijuana at this level for a long time." Additionally he was using hydrocodone and "admits he may have used abusively back in 2005 or 2006." 16f/3. The Axis I diagnosis was cannabis dependence, generalized anxiety disorder and major depressive disorder; GAF 45. Dr. Clyne first saw claimant in January 2008 and started him on a mood stabilizer depakote for anger and lamictal for depression. In February 2008 he was worried he would go to jail for past due child support and might lose his driving license; he was still smoking cannabis. In March 13, 2008 he reported depakote was working for him but "he does have situational depression. His moods are much more stable. No side effects or TDK."

-13-

He told Dr. Clyne he was fired from his work with Von Busch Refuse because he "couldn't get to work". (Exhibit 16F/2) However, he testified that his employment there ended because pain prevented him from getting into and out of the garbage truck—not because of an inability to get to the worksite.

He also told her in July of 2008 that he "found a job but cannot work without a (driver's) license but is still looking". (Exhibit 27F/l)

He indicated that he stopped going to the mental health center after he was discharged because he "missed some appointments". He said that he had not been treated for his mental condition for at least two years. He said he had called the clinic and said they "had a year or so waiting list to get back in there". He said he had not called the county mental health clinic but indicated he would do so after the undersigned inquired about it.

The claimant testified that he did not return to Dr. Clyne's office after she prepared and submitted the checklists in support of his claim for disability. Thus, the undersigned infers that his primary motivation was to obtain benefits rather than address the psychological problems he described.

Little weight is given to the questionnaires from Dr. Clyne as they are not based on longitudinal treatment, and further claimant failed to follow through and admits he stopped taking the medication. At the supplemental hearing in June 2010 he said he was not alleging a mental complaint. There is a significant gap in treatment from spring/summer 2008 until Dr. Clyne filled out the questionnaires, and no evidence that she followed him for more than a few sessions of medication management.

The opinion of Dr. Clyne is not given controlling weight. Greater weight is given to the analysis of Dr. Branham at 21f who discussed the complicating factor of drug usage and found that even with all conditions, including drug dependence, claimant's mental status does not meet or equal a listing.

Greater weight is given to the medical expert who testified at the first hearing on January 6, 2010. Clinical psychologist Dr. Thomas England testified and his opinion is give great weight. At that hearing claimant testified he was participating with the Centerpointe program because his disabled finance was a client. He said he had tried counseling but didn't like his counselor (She said if I didn't her her [*sic*], get a different counselor"), then switched to "Michael" but ended counseling when he went to jail. He did not return to counseling or Dr. Clyne after he was released from jail and at the time of January 2010 hearing, he had been off meds for "7-8 months." He said that as a term of his probation he successfully graduated from a drug/alcohol treatment program. He said that he was not alleging a mental impairment and was better. He said, "I know how to calm my temper down. Something comes up and I don't get mad like I used to."

Medical expert Dr. England found the severe impairments of depression, anxiety, personality disorder and substance abuse did not meet or equal a listing. He felt claimant had few restrictions on ability to carry out work activities, and could handle at least unskilled work, possibly work that was semi-skilled or more complex. He noted that claimant had improvement with treatment and noted the GAF score had increased by June 2008. Specifically Dr. England disagreed with the severity of the checklist from Dr. Clyne.

The undersigned also agrees with the opinion of Dr. England, the medical expert, and gave claimant the benefit of doubt by using a residual functional capacity for unskilled work even though claimant has not sought any treatment.

He told the consulting psychologist that he "shakes" and "gasps" for air when he is in a crowd of people and that he feels "uncomfortable and weird" when he is having a conversation around people and he must leave abruptly without finishing the conversation. (Exhibit 66F/3)

If he were actually experiencing those limitations and symptoms, he would seek medical care especially since it is available to him at no cost.

**Re his back pain:** Today, claimant does not take any prescription medication and, apart from going to the emergency room, he has not received any medical care for many months. In view of that circumstance, it is unlikely he is actually experiencing the oppressive symptoms he described in his testimony and in his statement to the consulting psychologist. For example, he said his back "locks" into place when he bends to pick up his young daughter. He said he feels "unsafe" getting out of the bathtub at times and that he cannot even pickup his daughter's toys from the floor. He also said that his pain prevents him from holding his daughter as he desires.

At the hearing, the undersigned specifically asked the claimant if Dr. Tomes had ever provided him with any recommendations regarding restricting his activity. He said that he could not recall the doctor ever doing that. However, the record shows that Dr. Tomes specifically told him on June 22, 2010 that he should "be productive" and that he should not lift over 40 pounds repetitively. (Exhibit 61F/l) In August of 2010, the claimant told a doctor at the emergency room that he "has 40-pound lifting restrictions". (Exhibit 63F/53) At his next visit there, the claimant acknowledged that he was not following that recommendation "because he has to work and make money". (Exhibit 63F/42)

It is unlikely that the claimant did not recall that Dr. Tomes had told him he was free to work so long as he did not lift more than 40 pounds.

As noted above in Finding #2, there are many references in the record to the claimant performing work activity that would be at a greater exertional level than the undersigned has specified in Finding #5. This evidence tends to show that he is not as limited as he described in his testimony.

**Discredit treating opinions:** The record contains several opinions of medical sources regarding the claimant's functional capacity.

Dr. Clyne, the psychiatrist who treated the claimant, completed some forms regarding the claimant's functional limitations. She indicated there that she believed the claimant would have substantial limitations in areas such as following a work schedule; working near other people without

-16-

being distracted; performing work at a consistent pace; interacting appropriately with supervisors; and getting along with coworkers without exhibiting "behavioral extremes". (Exhibit 40) She also wrote that he had a "poor" capacity for relating to co-workers; deal with the public; deal with work stress; maintain attention; behave in a stable manner; and "demonstrate reliability". (Exhibit 41)

The undersigned gives little weight to those opinions. They are not supported by other substantial evidence in the record and appear to be inconsistent with the progress notes she prepared. For example, at the last session she had with the claimant prior to completing the form, she wrote that he told her his medications were working for him. He said he had not experienced any "anger outbursts". His appearance was appropriate and he was cooperative with a euthymic mood. He denied depression and said he had moderate anxiety. His motivation was good and he had no problems sleeping. He was logical and his insight was good. He had not had a substance relapse and his status was "improved". (Exhibit 51F/9) In addition, Dr. Clyne endorsed a report regarding the claimant that assigned him a GAF score of 60 in July of 2008. (Exhibit 27F/7)

As discussed above, the undersigned gives great weight to the psychologist who testified at the January 2010 hearing and also the psychologist at 21f.

That evidence is inconsistent with her opinions reflected in the checklists included in the record. As noted above, the psychologist who examined him in February of 2011 expressed his opinions regarding the claimant's functioning. In general, he concluded that the claimant would have only "moderate" limitations in his ability to perform complex or detailed work and to interact appropriately on the job. (Exhibit 68F)

The undersigned has given weight to those opinions and has limited the claimant to simple and repetitive work that does not involve significant social interaction.

-17-

His primary care physician, Dr. Craig, wrote in September of 2008 that he was not willing to "give him any excuse for not seeking work". (Exhibit 42F/6)

It is interesting to observe that, in July of 2006, the claimant sought a "work ability note" from his family doctor as well as from Dr. Tomes. (Exhibit 42F/10) However, he was actually employed then as a full-time driver for a refuse service. (Exhibit 4E/3)

The undersigned gives the greatest weight to the opinion repeatedly expressed by Dr. Tomes. He treated the claimant for several years and performed both the lumbar and the cervical spine surgery. He has had an extensive opportunity to observe the claimant and to evaluate his medical condition.

In June of 2010, Dr. Tomes wrote his opinion that the claimant had recovered well from the surgery on his neck a few months earlier. He had only "slight stiffness" with "no obvious neck pain" when the doctor examined him on April 27, 2010. As noted above, Dr. Tomes stated his conclusion that the claimant could work so long as he did not lift more than 40 pounds. (Exhibit 60F/2)

After examining the claimant and reviewing the x-rays taken in March of 2011, Dr. Tomes did not identify any functional restrictions. He simply stated that the claimant was "OK to continue to be up and around". (Exhibit 69F/2)

In November of 2008, Dr. Tomes had completed two forms in which he identified some other functional limits on sitting, standing, lifting, moving his head and neck, etc. (Exhibits 35F and 52F) This was ***before*** the first of the claimant's two surgeries. The undersigned has also incorporated these limits into the findings regarding his residual functional capacity.

In sum, the reader is referred to the prior denial found at 7A, which is incorporated as though set out fully herein. After a third hearing was conducted and claimant given every opportunity to present his evidence,

the above residual functional capacity assessment is supported by substantial credible evidence in the record and best reflects his capacity.

**6. Step 4—The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

At the hearing, the vocational expert testified that, with the functional limitations specified above, the claimant would be unable to perform any of his past relevant work.

**7. The claimant was . . . 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963)**

**8. The claimant has a limited education and is able to communicate in English. (20 CFR 404.1564 and 416.964)**

**9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled. (20 CFR 404.1568 and 416.968)**

**10. Step 5—Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

* * *

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

**Step 5—other work identified**: The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a cleaner (97,000, 200,000); laundry worker (1,000, 15,000); and office helper (2,000, 50,000). (The figures in parentheses following the occupation title represent the approximate number of jobs in that occupation in the four-state region of Nebraska, Kansas, Iowa, and Missouri and in the national economy, respectively.)

At the first hearing (see 7A) the vocational expert further identified jobs of: fast food worker, cashier, and driver; again see 7A for details of incidence of these jobs.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2006 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g))**

(Tr. 19-31(bold-face type and other emphasis in original).)

On August 12, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council (Tr. 7-13). The request for review was denied on July 13, 2012 (Tr. 1-3). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008).

Plaintiff filed this action on September 16, 2012.

-20-

## II. Issues

Plaintiff contends the ALJ's decision is contrary to law and is not supported by substantial evidence on the record as a whole.  In general, Plaintiff complains that the ALJ incorrectly assessed his residual functional capacity because she omitted certain physical impairments, did not give proper weight to medical opinions, and did not properly evaluate Plaintiff's credibility; he also complains that the ALJ did not accept the testimony of a vocational expert regarding an alternative RFC assessment.  More particularly, Plaintiff states he has "seven areas of concern" about the ALJ's decision:

> First, the ALJ, in her action left in place by the Appeals Council, failed to find that plaintiff's unrefuted facet osteoarthritis, changes of anterior fusion C6-7, focal degenerative changes at C5-6 and C1-2, chronic low back pain and kidney stone renal colic, were severe impairments, pursuant to SSR 85-28 and *Gilbert v. Apfel*, 173 F.3d 602 (8th Cir. 1999).

> Secondly, the ALJ, in her action left in place by the Appeals Council, failed to accept the testimony of the vocational expert (VE) that a person with the limitations and problems identified by the ALJ in her decision dated July 15, 2010, would be unable to perform his past relevant work or any other work in the national economy.

> Further, the ALJ failed to accept as controlling the limitations and restrictions placed upon the plaintiff by his neurosurgeon of several years, Dr. Daniel J. Tomes. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). SSR 96-2p. Even if the opinions of the treating source was not entitled to controlling weight, the ALJ in her action left in place by the Appeals Council failed to give the opinions of Dr. Tomes the greatest weight based on his examining relationship, his treatment relationship (as to length of treatment, frequency of treatment and the nature of the treatment), the supportability of his opinions and the consistency with the record as a whole. SSR 96-2p. 20 C.F.R. §416.927(d).

> In addition, the ALJ failed to accept as controlling the limitations and restrictions placed upon the plaintiff by his psychiatrist of about one and

-21-

a half years, Dr. Diana Clyne. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). SSR 96-2p. Even if the opinions of the treating source was not entitled to controlling weight, the ALJ in her action left in place by the Appeals Council failed to give the opinions of Dr. Clyne the greatest weight based on her examining relationship, her treatment relationship (as to length of treatment, frequency of treatment and the nature of the treatment), the supportability of her opinions and the consistency with the record as a whole. SSR 96-2p. 20 C.F.R. §416.927(d).

Further, the ALJ noted the opinions of the DDS psychological evaluation performed by Dr. Lee Branham, Ph.D., at the request of the disability determinations section after the application was filed herein, but she did not follow those opinions and she gave an erroneous reason why such opinions should be discredited. 20 C.F.R. §§ 404.1527(a) through (d) and 416.927(a) through (d).

In another respect, the ALJ improperly made a finding of not disabled because the ALJ noted the opinions of Dr. Newton White, M.D., who testified at one of the hearings of the plaintiff at the request of the ALJ, but she did not follow those opinions and she gave an erroneous reason why such opinions should be discredited. 20 C.F.R. §§ 404.1527(a) through (d) and 416.927(a) through (d).

Finally, the decision of the ALJ, left in place by the Appeals Council, did not properly apply *Polaski v. Heckler*, 739 F.2d 1320, supplemented 751 F.2d 943 (8th Cir. 1984) vacated 476 U.S. 1167, 106 S. Ct. 2885, 90 L.Ed. 2d 974, adhered to on mandate, 804 F.2d, 456 (8th Cir. 1986) cert. denied, 482 U.S. 927, 107 S. Ct. 3211, 96 L.Ed.2d 698 (1987) when determining the credibility of the plaintiff's subjective allegations of his physical and mental condition as to his limitations, restrictions and ability to perform work-like activity. SSR 96-7p, 20 C.F.R. §404.1529.

(Filing 16 at 22-23 (paragraphs supplied).)   I will discuss these "seven areas of concern" in the same order that they are listed by Plaintiff.

### III. Discussion

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995).

"'Residual functional capacity' [('RFC')] is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. . .. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996).

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal quotations and citations omitted).

-23-

### A. Plaintiff's Physical Impairments

The ALJ determined at step two of the sequential analysis that Plaintiff is severely impaired by "the residuals of fusion surgery in his cervical and lumbar spine" (Tr. 21). No other "severe" physical impairments were found.[5] Plaintiff complains that the ALJ "failed to find that [he] was suffering from facet osteoarthritis, changes of anterior fusion C6-7, focal degenerative changes at C5-6 and C1-2, chronic low back pain and kidney stone renal colic," and asserts that "[t]he ALJ did not even acknowledge these conditions" (filing 16 at 26).

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." Social Security Ruling 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996).

Regarding the claimed "kidney stone renal colic" diagnosis, hospital records from BryanLGH Medical Center-West show that Plaintiff went to the emergency room on September 30, 2010, and October 4, 2010, complaining of abdominal pain (Tr. 1494-1523). CT scans revealed a small (2mm) calcification in the left upper

---

[5] "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." Id.

-24-

pelvis, which was believed to represent a proximal ureter stone (Tr. 1505, 1522). Plaintiff was treated for pain and referred to a urologist (Tr. 1501). There is no record of further treatment for this condition nor any evidence that Plaintiff continued to experience abdominal pain.  Consequently, the ALJ's failure to find that Plaintiff is impaired by "kidney stone renal colic" was not error.  *See Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) (ALJ need only include impairments that are supported by the record and accepted as valid).

There is evidence to support Plaintiff's claimed back impairments, including a radiology report dated March 28, 2011, which states, among other things, that "[m]oderate facet osteoarthritis is seen especially in the mid to thoracic spine," that "[t]here are changes of anterior fusion at C6-7" since March 28, 2011, when x-rays were last taken of Plaintiff's cervical spine, and that "[m]ore focal degenerative changes are seen at C5-6 and C1-2" (Tr. 1570).  Exhibits 35F and 52F, which are two RFC questionnaires that were completed by Daniel J. Tomes, M.D., on November 29, 2008, state that Plaintiff experienced chronic low back pain (Tr. 1298, 1430),[6] and an MRI performed August 26, 2005, noted mild disc degeneration throughout Plaintiff's lumbar spine (Tr. 636-637).

The ALJ's decision references the 2008 questionnaires that were completed by Dr. Tomes (Tr. 30), and Dr. Tomes' office notes (Exhibit 5F) to which the 2005 MRI report is attached (Tr. 21), but does not specifically mention the 2011 radiology report. However, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

---

[6] Dr. Tomes' opinions about exertional limitations imposed by Plaintiff's back problems will be discussed subsequently.

The ALJ's decision notes that Plaintiff received conservative care for back pain beginning in 2005, including medication, physical therapy, and injections, and that he had fusion surgery on his lumbar spine in 2009 and on his cervical spine in 2010 (Tr. 21). The decision also contains an extensive discussion of Plaintiff's complaints of back pain and neck pain. Ultimately, the ALJ concluded that Plaintiff's complaints were not entirely credible (Tr. 28).

The ALJ identified "the residuals of fusion surgery in [Plaintiff's] cervical and lumbar spine" as a severe impairment. Although this description is non-specific, and could be understood to refer to residual *effects* of fusion surgery rather than to impairments of Plaintiff's cervical and lumbar spine that were not resolved by surgery, the overall discussion in the ALJ's decision shows that she gave adequate consideration to all of the evidence regarding the condition of Plaintiff's neck and back. "[A]n arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)).

### B. Vocational Expert's Testimony

More troublesome is the ALJ's observation that "[i]n November of 2008, Dr. Tomes had completed two forms in which he identified some other functional limits on [Plaintiff] sitting, standing, lifting, moving his head and neck, etc. (Exhibits 35F and 52F)," and the ALJ's statement that she had "incorporated these limits into the findings regarding [Plaintiff's] residual functional capacity" (Tr. 30). In addition to restricting Plaintiff to occasional lifting of 50-pound weights and occasional twisting, stooping, crouching, and climbing movements, Dr. Tomes opined in Exhibits 35F and 52F that Plaintiff can only sit for 2 hours at a time and 4 hours total during an 8-hour workday, can only stand for 2 hours at a time, and can only stand or walk for a total of 4 hours during an 8-hour workday; that Plaintiff needs a job that will permit him to shift positions at will from sitting, standing, or walking; that every 90 minutes (the

-26-

longest interval listed on the form) Plaintiff must walk around for 10 minutes; and that Plaintiff must have one unscheduled 10-minute break during an 8-hour workday (Tr. 1300, 1432-1433). Contrary to the ALJ's statement, the limitations regarding sitting, standing, and walking were not incorporated into her assessment of Plaintiff's RFC in the June 15, 2011 decision (Tr. 24), nor were they included in the hypothetical the ALJ posed to the vocational expert ("VE") at the May 11, 2011 hearing.  In fact, the VE was instructed to assume that there were "no restrictions on stand, sit or walk" (Tr. 139).   The hypothetical posed by the ALJ also omitted any requirement that the employee be permitted to change positions at will, to walk around every 90 minutes, and to take one unscheduled 10-minute break.

The RFC assessment in the ALJ's original decision, issued on July 15, 2010, *did* include limitations on sitting, standing, and walking that were generally consistent with Dr. Tomes' opinions.  The original RFC assessment read as follows:

> **5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can climb, balance, stoop, kneel, crouch, and crawl only occasionally. He can sit or stand for only two hours at a time before needing a break. He can stand and walk for a total of four hours each a day He needs a 10-minute break from work every 90 minutes. He cannot climb ladders, ropes, or scaffolds. He can flex, extend, and rotate his neck only occasionally.**

(T164 (bold-face type in original).)

The ALJ also included these limitations in the hypothetical that was posed to the vocational expert, Steven Koon, during the second hearing on June 9, 2010:

EXAMINATION OF THE VOCATIONAL EXPERT BY THE ADMINISTRATIVE LAW JUDGE:

-27-

Q We have a younger worker limited education, his past work is all heavy. We established that at the last hearing. This case calls for a step five analysis ability to do other work. First question is for a worker who could occasionally lift or carry 20 to 50 pounds, frequently lift or carry 10 pounds. I want to use light exertion.

I don't want to get into medium work so let's just say occasionally 20, frequently 10 pounds; stand sit or walk at least four hours in an eight hour day. Can sit for two hours at a time, stand for two hours at a time; could need one break a day for ten minutes every 90 minutes. So that would appear to be accomplished during breaks. Postural activities occasional for everything including neck movement, up down and sideways.

A [sic] So that would be climb, balance, stoop, kneel, crouch, crawl, neck flection and side to side. With that functional capacity, could you indicate any type of work such an individual could perform?

A Your Honor, the sit, stand and walk you said four out of eight hours?

Q Yes, I'm using Dr. Thoms' [sic] recommendations.

A That's four hours in each one of those capacities?

Q Well, he said that that person could sit for two, stand for two, but then he checked in an eight hour day four hours sit, four hours stand which looks like well I'm not going to say what it looks like.

A Your Honor, it would be my opinion that this hypothetical could require a sit/stand option either at the light or sedentary level in both capacities, and at least at the minimum in those jobs that would allow for a sit stand option would include positions such as an Assembler, DOT number is 706.684-022. I see approximately 500 positions and State of Nebraska is 500. These would be both light and sedentary positions in the State of Nebraska approximately 500 and nationally approximately 60,000.

Q Now is that 5,000 each at sedentary and light?

-28-

A No it would be 500 total Your Honor for the State of Nebraska and 60,000 nationally; both the sedentary and light combined. The reason for those numbers is because my understanding is the hypothetical requires a sit/stand option so that he's not sitting or standing more than four hours in either capacity. He would be able to work as an Office Helper, DOT number 329.567-010. State of Nebraska this would be the light sedentary physical demand would allow for the hypothetical, approximately 400 positions and nationally 60,000 positions at the sedentary physical demand level. Approximately 300 positions for the State of Nebraska and 70,000 nationally. And as a Cashier, DOT number 211.462-010 the State of Nebraska needs to be at the light physical demand generally on the light physical demand level. State of Nebraska approximately 2,000 positions and nationally approximately 150,000 positions.

Q Have you adjusted these numbers downward from the full range of light and sedentary jobs because of the sit, stand?

A Yes, Your Honor.

Q Okay what is the source of the numbers?

A The source of the numbers is the information at The Department of Labor.

Q Any discrepancy between your testimony and *The Dictionary of Occupational Titles* or *The Selective Characteristics Occupational Manual*?

A The only difference would be that those manual resources do not specifically talk about sit/stand options and the claimant.

(Tr. 110-112.)  Based on the VE's testimony,[7] the ALJ found that Plaintiff "is capable

---

[7] A different vocational expert testified at the first hearing on January 6, 2010. That VE indicated that a hypothetical claimant with Plaintiff's RFC, including no restrictions on sitting, standing, or walking, could perform "a fairly wide variety of unskilled light and sedentary work" (Tr. 78). When the ALJ showed Exhibit 35F to the VE, however, he was unable to say whether a hypothetical claimant who has the

of making a successful adjustment to other work that exists in significant numbers in the national economy," such as assembler, office helper, and cashier jobs (Tr. 169).

Mr. Koon also testified at the third hearing on May 11, 2011. The following exchange occurred:

EXAMINATION OF THE VOCATIONAL EXPERT BY THE ADMINISTRATIVE LAW JUDGE:

Q All right. Younger individual, limited education. . . . [R]esidual functional capacity is for light exertion and this is a step five analysis. Okay the first question is light exertional. Assume an individual with this vocational profile who could occasionally lift 20 pounds frequently, lift or carry 10 pounds, no restriction on stand, sit or walk; can do all those activities six hours in an eight hour day; occasionally can perform postural activities, climb, balance, stoop, kneel, crouch, crawl; not work on ladders, ropes or scaffolds.

Regarding his neck, he should only occasionally flex, extend or rotate his neck so this should  not be a job where he is required to frequently or constantly be straining his neck, extending it or rotating it, and then from a mental stand point, unskilled work, SPV1-2, routine, competitive work that doesn't require extended concentration or attention and social interaction can be occasional but not constant or frequent with co-workers, supervisors and the general public. With that functional capacity, could you identify any work that a younger person with limited education could perform?

_____

limitations listed by Dr. Tomes would be able to perform any of the representative jobs that were previously identified.  The VE stated: "Your Honor the difficulty I am having with it is on page three where it indicates how much you can sit and stand. I don't have any problems where he would have been able to do that work, would have been able to stand/walk four hours and sit four hours the problem starts when it is necessary for him to walk around every 90 minutes for about 10 minutes and also that he needs to take a unscheduled break once a day for 10 minutes. . . . [I]t makes it a little difficult to perform those jobs, I can't give you numbers of how many would be left or rather [*sic*] they would even constitute substantial numbers" (Tr. 81).

A Your Honor give this functional capacity, it's my opinion that the individual could perform work as a Cleaner, DOT 323.687-014. That's light, unskilled work, SPV2. Regionally which includes the State of Nebraska, Iowa, Kansas and Missouri would be approximately 7,000 positions and nationally 200,000 positions. And he could do work as a Laundry Worker, DOT 361.685-010 that's light unskilled, SPV2.

Regionally it might be 1,000 position, nationally approximately 15,000 positions. He would be able to work as a Office Helper, DOT 239.567-010, light unskilled work; regionally approximately 2,000 positions and nationally 50,000.

Q What is the source of the numbers you have identified?

A The source of the numbers is information from The Department of Labor, Your Honor.

Q Any discrepancy between I your testimony and *The Dictionary of Occupational Titles* in terms of the jobs, exertional levels or skill levels?

A No, there is not, Your Honor.

Q If you would consider the full range of unskilled light and the sedentary work, what percent of the full range, do you feel that you retain with this hypothetical?

A I'd say approximately 50 percent.

Q At both exertions?

A Yes, Your Honor.

Q Ms. Newhouse, any questions?

ATTY: Yes, thank you.

EXAMINATION OF THE VOCATIONAL EXPERT BY THE ATTORNEY:

-31-

Q If you were to take the judge[']s first hypothetical that you identified jobs and add to it that a person can sit for two hours before needing to get up and stand for two hours at one time before needing to sit down or walk around, the total a person could sit or stand or walk in an eight hour working day would be sit for four hours and stand for four hours, would need to include periods of walking around during an eight hour working day every 90 minutes for 10 minutes would need a job that would permit shifting positions at will from sitting, standing or walking and sometimes would need to take unscheduled breaks during an eight hour work day at least once a day for ten minutes. Would that change your answer to the judge's first hypothetical?

A Yes, it would.

Q How so?

A The Cleaner position and the Laundry position most likely would not allow for the sit stand parameters that you provided. The office helper position would allow for changes of position that I think generally would fit within this hypothetical except for the very strict criteria that they can only sit for four hours and stand for four hours with no variance between those and that would be the issue.

ALJ: What about laundry worker?

A The laundry worker is primarily going to be on your feet so I would exclude that and the painter position based on this hypothetical.

***

ALJ: Okay. Now for the first question that you asked was that he needed breaks every 90 minutes and breaks once a day for 10 minutes. What was that from?

ATTY: That was from 35f, Your Honor and 52f.

ALJ: Well, that's a little puzzling to me because the last time Mr. Koon testified and looked at those documents and said the claimant could do

-32-

the jobs, so I think maybe we need to ask Mr. Koon to take a look at those documents because I want to give him a chance to clarify why he said that they could be done at the last hearing, and I don't know if it was the way they were read to him or what but why don't you take a look at that. Is there an additional document you wanted to look at?

* * *

ALJ: Well back to you Mr. Koon. Is there anything in that checklist that was done before the surgery that would preclude the 50 percent of light and sedentary jobs and the three that you have identified?

A It appears that based on my review of those two documents that the documents are primarily the same document as far as restrictions or the limitations. It seems like the documents that say what he could stand for, sit for. He says that they can sit for two hours at a time, stand for two hours at a time for a total of four hours in each [INAUDIBLE] in an eight hour day; needs a break once a day for 10 minutes outside of the scheduled breaks is the way I read that and he would need to be able to walk around it would be 90 minutes.

My response to this hypothetical on this particular occasion was that I don't know of any jobs that have a strict limit that I could provide a strict limitation that they are only going to be able to sit for four hours a day and walk for four hours a day or stand for four hours a day. Within that narrow range, I'm not able to identify jobs that are going to spend half their time [INAUDIBLE] .

ALJ: Did you read the checklist to mean eight hours has to be split down the middle, four sit, four stand?

A It's not allowing for any different interpretation. It says two hours at a time in each capacity with a total of four hours in each capacity. That's the way I read that.

ALJ: All right and Ms. Newhouse is saying that she contacted him and he was not willing to revise that?

-33-

ATTY: He didn't update it.

ALJ: I think the only restriction I saw was where he had said not to lift over 40 pounds is what he said after surgery and that was the only thing he did post surgery, and this last time your client didn't ask him, but he has not been willing to give any further restrictions. Okay all right, so Mr. Koon you're saying that if a person had to have a job strictly defined as sit four hours and stand, you don't think that they could do those jobs and I assume the DOT doesn't break it down that way.

A It does not break it down that way. It breaks it down in these jobs would primarily be classified as light work based on the sitting limitation because he is not sitting for six hours out of an eight hour day so it's primarily light work but requires a pretty vague list of requirements putting a strict interpretation of how much time you spend sitting or standing.

ALJ: If I just were to say use common sense; and the doctor said he can lift 40 pounds. You're just not comfortable saying anything based on this checklist because the DOT doesn't tell you jobs that are sit four hours, stand, four hours, sit? I mean does it sound like sit/stand or does it sound to you like the doctor was meaning light or sedentary or you just don't care to venture, I guess?

A My interpretation what the doctor said was it would allow for a strict, light work because there is not sufficient sitting to allow for the definition of sedentary work. Sedentary work you have to be seated according to the listing that I know six hours out of an eight hour day. This hypothetical does not allow that it only allows for sitting up to four hours a day, so sedentary work would not be appropriate.

Light work which would be appropriate based on the hypothetical and the lifting, and I'm looking at 52f says he can lift up to 50 pounds occasionally, but in excess of 20 pounds would be light work, but I don't know of any jobs in the national economy that would fit a strict requirement of saying you could sit for four hours and stand for four hours. Those jobs may exist, but I can't testify the numbers of those jobs existing. That's just pretty strict.

-34-

ALJ: Obviously I assume it would be helpful to you if the doctor would clarify that, but the doctor has not. Correct?

A Yes.

ALJ: All right anything else Ms. Newhouse?

ATTY: No, Your Honor.

(Tr. 139-142, 145, 147-149.)

I can only conclude that the ALJ's erroneous statement in the June 15, 2011 decision, to the effect that she had incorporated the limitations noted in Exhibits 35F and 52F into her findings regarding Plaintiff's residual functional capacity, was made unintentionally. An identical statement appears in the ALJ's original decision of July 15, 2010 (Tr. 167). On that date the statement was true. Comparing the two decisions, it is obvious that the original decision provided the framework for drafting the final decision. It appears the ALJ struck the sitting/standing/walking and work-break limitations from the RFC determination (finding #5 in both orders), but then neglected to strike the subsequent statement which indicated that these limitations were still included in the RFC. Such a drafting error does not require reversal.

The real issue here is whether the ALJ was justified in striking the limitations, or whether she was required to include them in the RFC as representing the opinion of Plaintiff's neurosurgeon, Dr. Tomes. That issue will be examined next.

### C. Medical Opinions

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2),

-35-

416.927(c)(2).  Otherwise, the weight given to a medical opinion[8] depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996).  A decision which is not fully favorable "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.  See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

### 1. Dr. Tomes

The June 15, 2011 decision indicates the ALJ gave "the greatest weight to the opinion repeatedly expressed by Dr. Tomes" (Tr. 29).  Specifically, the ALJ noted that "[i]n June of 2010, Dr. Tomes wrote his opinion that the claimant had recovered well from the surgery on his neck a few months earlier . . . [and] stated his conclusion that the claimant could work so long as he did not lift more than 40 pounds. (Exhibit 60F/2)" (Tr. 29-30).  The ALJ further noted that "[a]fter examining the claimant and

---

[8] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) .

reviewing the x-rays taken in March of 2011, Dr. Tomes did not identify any functional restrictions.  He simply stated that the claimant was 'OK to continue to be up and around'. (Exhibit 69F/2)" (Tr. 30).

The first document referenced by the ALJ, page 2 of Exhibit 60F, is a letter dated June 19, 2010, from Dr. Tomes to Plaintiff's attorney, in which he was responding to the following inquiry:

> The administrative law judge would like to know your opinion of Raymond[']s recovery time from his cervical spine fusion on April 4, 2010.  If you can opine as to when Raymond would be able to return to work or provide any limitations on his condition, it would be extremely helpful.

(Tr. 1476.)  Dr Tomes responded:

> I last saw Raymond in the clinic on April 27, 2010.  At that point he was reporting some slight stiffness of his neck from that surgery, but no obvious neck pain.  His arms were improving bilaterally.  At this point, I think Raymond could look to return to work. . . .  As far as any limitations, I think while he had limited him to lifting only 15 pounds at first status post the operation; at this point, given his lumbar and cervical interventions, an upper limit of 40 pounds is reasonable in my opinion.

(Tr. 1476.)  Dr. Tomes also examined Plaintiff a few days later, on June 22, 2010, and confirmed his opinion. Although Plaintiff reported "some neck and/or back discomfort at times," he "appear[ed] to have good range of motion of his neck and ambulate[d] quite well" (Tr. 1477).  Dr. Tomes "encourage[d] Raymond to look to activities to become productive" and stated, "I think he can lift up to 40 pounds" on a non-repetitive basis (Tr. 1477).

Significantly, the ALJ observed that Dr. Tomes had completed the two RFC questionnaires (Exhibits 35F and 52F) "***before*** the first of the claimant's two

-37-

surgeries" (Tr. 30 (emphasis is original)).[9]  Under the circumstances, it was proper for the ALJ to rely upon Dr. Tomes' subsequent opinions that the two surgeries were successful in alleviating Plaintiff's neck and back problems.[10] "Impairments that are controllable or amenable to treatment do not support a finding of disability." _Davidson v. Astrue_, 578 F.3d 838, 846 (8th Cir. 2009).

### 2. Dr. Clyne

In December 2008, Dianne M. Clyne, M.D., a psychiatrist, responded to three questionnaires provided by Plaintiff's attorney. She stated in a "mental impairment evaluation" (Exhibit 39F) that Plaintiff was diagnosed with post traumatic stress disorder (PTSD), major depression, obsessive compulsive disorder (OCD), cannabis dependency, intermittent explosive disorder, and "rule out" bipolar disorder, and that his mental impairments would frequently interfere with attention and concentration (Tr. 1342-1343).  In a "mental capacities evaluation" (Exhibit 40F) Dr. Clyne noted that Plaintiff has moderate to marked limitations in most mental functions and would

---

[9] This observation was also made in the ALJ's original decision of July 15, 2010 (Tr. 167). While one might question why the ALJ chose to incorporate the outdated November 2008 questionnaire responses into the original RFC assessment, it must be remembered that the second hearing was held on June 9, 2010—ten days before Dr. Tomes wrote to Plaintiff's attorney with a revised opinion.  Thus, although the ALJ had Dr. Tomes' letter in hand when the original decision was issued, it was not available at the time of the hearing.  Because the VE's testimony established that Plaintiff was employable even with the restrictions on sitting, standing, and walking, there was no need to convene a supplemental hearing based on the new information.

[10] Plaintiff notes that his attorney asked Dr. Tomes following the lumbar spine surgery whether his opinions rendered in November of 2008 had changed, and the doctor responded January 11, 2010, that "at this point, without any further intervention pertaining to his cervical spine, I would not change any of the responses listed . . . as had been previously filled out" (Tr. 1429).  This evidence, however, is negated by the fact that there was further intervention pertaining to Plaintiff's cervical spine—Dr. Tomes performed a cervical fusion in April 2010.

not be able to work more than 4 hours per day, 3 days per week (Tr. 1345-1347). Finally, Dr. Clyne generally rated Plaintiff's abilities as fair to poor in a "medical statement of ability to do work-related activities" (Exhibit 41F).

The ALJ gave little weight to Dr. Clyne's opinions, stating that "they are not based on longitudinal treatment, and further claimant failed to follow through and admits he stopped taking the medication" (Tr. 27). The ALJ observed that "[t]here is a significant gap in treatment from spring/summer 2008 until Dr. Clyne filled out the questionnaires, and no evidence that she followed [Plaintiff] for more than a few sessions of medication management" (Tr. 27). The ALJ also inferred from Plaintiff's failure to return to Dr. Clyne's office after she completed the questionnaires that "his primary motivation was to obtain benefits rather than address the psychological problems he described" (Tr. 27).

The ALJ found that Dr. Clyne's opinions "are not supported by other substantial evidence in the record and appear to be inconsistent with the progress notes she prepared" (Tr. 29). The ALJ specifically noted that when Dr. Clyne saw Plaintiff for medication management in October 2008, she wrote that "[h]is overall status is improved" (Tr. 1426). It was also noted that Dr. Clyne endorsed a report in July 2008 that discharged Plaintiff from counseling treatment at CenterPointe and assigned him a GAF score of 60 (Tr. 1253-1254).[11]

The ALJ gave greater weight to the opinions of Lee Branham, Ph.D., a state agency consulting psychologist who completed a mental RFC assessment and psychiatric technique review form in June 2008 (Tr. 1131-1149), and Thomas

---

[11] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (*DSM-IV-TR*) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See DSM-IV-TR* 32 (4th ed. 2000). A GAF score of 51 through 60 is characterized by moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id.* at 34.

England, Ph.D., a clinical psychologist who testified as a medical expert at the first administrative hearing in January 2010 (Tr. 60-68). The ALJ stated that Dr. Branham "found that even with all conditions, including drug dependence, claimant's mental status does not meet or equal a listing" (Tr. 27), and that Dr. England "disagreed with the severity of the checklist from Dr. Clyne" (Tr. 28). In addition, the ALJ noted that Gail Ihle, Ph.D., a psychologist who examined Plaintiff in February 2011 (Tr. 1565-1567), concluded that Plaintiff would have only moderate limitations in his ability to perform complex or detailed work and to interact appropriately on the job (Tr. 29).

"When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000). "Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). "Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight." *Id.* "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir.2010)). "An ALJ may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009)). Also, "a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson,* 696 F.3d at 793 (quoting *Wildman*, 596 F.3d at 964).

Plaintiff argues that Dr. England's opinion was flawed because Exhibit 51F, which contains additional medical records from CenterPointe, was not part of the record at the first hearing. *See McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011) ("[T]he opinion of a nonexamining consulting physician is afforded less weight if the

-40-

consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation.").  The additional records include Dr. Clyne's October 2008 notes that were referenced in the ALJ's decision (Tr. 1426), plus progress notes from November 2008 (Tr. 1423-1425), a December 2008 intake assessment (Tr. 1419-1422), and a discharge summary from September 2009 (Tr. 1418).  In November 2008, Dr. Clyne noted that Plaintiff reported his medications were working and said he was "[s]taying in good spirits but has frequent episodes of depression that lasts about ½ day; Plaintiff rated his depression at 3 out of 10 and his anxiety at 8 out of 10 (Tr. 1423).  Dr. Clyne assigned Plaintiff a GAF score of 30-35 (Tr. 1424).[12]  This was stated to be Plaintiff's highest score during the past year, even though his GAF score was 60 upon discharge from counseling in July 2008.  Dr. Clyne thought Plaintiff's motivation was good, he was alert and oriented, his insight and judgment were both fair, and his thought process, while racing, was goal-directed and logical (Tr. 1424).  The December 2008 intake summary was prepared when Plaintiff sought to resume counseling at CenterPointe "to address life stressors, impact of past issues on him currently, and recovery issues associated with marijuana use" (Tr. 1419).  Plaintiff was cooperative, his mood was euthymic with affect appropriate to content, he was well-oriented, his speech had adequate content, his thought process was goal-directed and his memory was intact with recall, he was able to follow the interaction and his intellectual functioning appeared average, he was not experiencing hallucinations or delusions, and he appeared to have fair insight but limited judgment (Tr. 1419).  Although counseling was approved, Plaintiff does not appear to have availed himself of the services offered.  In September 2009, he was discharged from the program for noncompliance (Tr. 1418).

_____

[12] A GAF of 21 to 30 indicates the individual's "[b]ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment ... or [an] inability to function in almost all areas." *See DSM-IV-TR* at 34. A GAF of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas.  *See id.*

-41-

These additional records do not invalidate Dr. England's opinion that Plaintiff's mental impairments are not as severe as indicated by Dr.Clyne's December 2008 checklist responses.  Although Dr. Clyne assigned Plaintiff a GAF score of 30-35 in November 2008, her accompanying notes do not support the low score; it is also inconsistent with the July 2008 discharge summary and Dr. Clyne's October 2008 notation that Plaintiff's overall status had improved.  Based on the record as a whole, I find that the ALJ's decision to discount Dr. Clyne's assessment was appropriate.

### 3. Dr. Branham

Plaintiff complains that the ALJ did not follow the state agency psychological consultant's opinion that he had moderate limitations in concentration, persistence, and pace (Tr. 1146). The ALJ found that Plaintiff had only mild difficulties in concentration, persistence, and pace (Tr. 23). She stated that there had been no indication in any progress notes that Plaintiff was unable to concentrate on simple and routine matters (Tr. 24).

In making the RFC assessment, however, the ALJ restricted Plaintiff to unskilled work categorized as SVP-1 or SVP-2, which is routine and repetitive work that does not require extended concentration or attention (Tr. 24). Thus, although the ALJ did not find that Plaintiff had more than mild difficulties in concentration, persistence, and pace, she nonetheless gave Plaintiff the benefit of the doubt and incorporated into his RFC restrictions that would accommodate even moderate limitations in concentration, persistence, and pace, consistent with Dr. Branham's opinion (Tr. 23-24, 1146). *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (ALJ's hypothetical concerning individual who is capable of doing simple, repetitive, routine tasks adequately captured plaintiff's deficiencies in concentration, persistence, or pace). Thus, any error regarding the ALJ's failure to fully accept Dr. Branham's assessment of Plaintiff's mental limitations was harmless under the circumstances.

-42-

### 4. Dr. White

Plaintiff claims entitlement to at least a closed period of disability based on testimony presented at the second administrative hearing by the medical expert, Newton White, M.D., who opined that as of November 3, 2008, Plaintiff's physical impairments equaled Listing 1.04C (Tr. 107). This listing applies to "[d]isorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord" with "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. pt. 404, subpt. P., App. 1 § 1.04C. "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id., at § 1.00B2b(1). In Dr. White's opinion, this condition would continue until 12 months after corrective surgery (Tr. 97-98). Dr. White conceded, however, that Plaintiff did not have difficulty ambulating (Tr. 107).

In the ALJ's original decision (which is incorporated by reference in the final decision), Judge Dutton rejected Dr. White's testimony, stating:

> The doctor said claimant "equaled a listing" but when asked which listing, he said 1.04C, but could not justify his answer and acknowledged there was no difficulty with ambulating. When asked what he based his opinion on, he said, "I never had anyone who could work within 12 months" and recited his standard practices with patients in the past. He said he was puzzled by the lack of physical therapy and no pain medications.

> In this regard, it appears that Dr. White misperceived his function at the hearing, did not understand the concept of meet/equal a listing, and substituted his judgment as to how he would have treated the claimant, rather than opine on the medical evidence. He provided extensive testimony regarding his clinical experience and observations of other patients who have had medical conditions and surgical intervention

-43-

similar to that of the claimant. For example, he testified that, in general, an individual who has lumbar fusion surgery is usually off work for 12 months. If he were the DDS evaluator, all claimant's alleging disability with a lumbar fusion would be approved for disability benefits. However, he did not cite any evidence in *this* record to support any opinion about how long it would take *this* claimant to recover. He stated that there were several aspects of the claimant's condition and treatment that were unclear to him. In the end, however, he stated that he was not comfortable substituting his judgment for Dr. Tomes, the treating surgeon, who opined claimant could so light to medium work based on the functional capacity, see 35f and 52f.

(Tr. 167-168). Because Dr. White's opinion is not supported by relevant evidence, and is inconsistent with the record as a whole, the ALJ did not err by not awarding Plaintiff a closed period of disability.

### D. Plaintiff's Credibility

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, third party and the claimant's statements, and factors such as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions. *See* 20 C.F.R. § 404.1529; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Plaintiff charges that "[t]he ALJ discounted plaintiff's claims of how his pain and mental conditions effect him with a couple of references to medial [*sic*] care that the plaintiff received in December of 2006" (filing 16 at 42-43), but, in point of fact, the ALJ's decision includes extensive discussion of the *Polaski* factors, with appropriate citations to the record. Substantial evidence supports the ALJ's decision to discount Plaintiff's subjective complaints.

-44-

4:12-cv-03196-RGK   Doc # 25   Filed: 08/05/13   Page 45 of 45 - Page ID # 1804

### IV. Conclusion

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

August 5, 2013.                          BY THE COURT:

                                         *Richard G. Kopf*
                                         Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.